J-A13030-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: G.R., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.C., NATURAL MOTHER, | |
| Appellant | No. 20 WDA 2015 |

Appeal from the Order December 4, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): TPR 140 of 2014

BEFORE: PANELLA, SHOGAN, and OTT, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JULY 07, 2015**

J.C. ("Mother") appeals from the December 4, 2014 order that granted the petition filed by the Allegheny County Office of Children, Youth and Families ("CYF" or the "Agency"), seeking to involuntarily terminate Mother's parental rights to her son, G.R. ("Child"), who was born in January of 2013, pursuant to 23 Pa.C.S. § 2511(a)(2) and (b) of the Adoption Act.[1] We affirm.

On July 31, 2014, CYF filed a petition to involuntarily terminate Mother's parental rights to Child. On November 18, 2014, the trial court

---

[1] In separate orders dated December 4, 2014, the trial court involuntarily terminated the parental rights of Child's father, G.R.R. a/k/a G.R. a/k/a A.R., as well as any unknown father, to Child. Neither Father nor any unknown father filed an appeal, nor are they a party to the instant appeal.

held a hearing on the petition. At the hearing, CYF presented the testimony of Justine Walz, the CYF caseworker assigned to the family and Terry O'Hara, a psychologist licensed in Pennsylvania who is a court-appointed forensic evaluator for the trial court, as an expert witness. N.T., 11/18/14, at 9-10, 61. Mother testified on her own behalf.

Based on the testimonial and documentary evidence, the trial court set forth the background of this case as follows:

> The child was born [in January of 2013]. The baby was born premature and was placed in the NICU immediately after birth. Staff from Children's Hospital contacted CYF and expressed a concern about the parents' ability to care for the newborn child. CYF first made contact with the family on January 8, 2013. After a brief investigation, CYF determined that Mother had an extensive mental health history including diagnoses of schizoaffective disorder, mild mental retardation, depression, bipolar and ADHD. Mother had a service coordinator through Mercy Behavioral Health and was active in medication management at the time of the child's birth. CYF had a number of concerns regarding Father's mental health issues and criminal history. Mother reported that there were domestic violence issues between her and Father.

> CYF continued to monitor the case, and the child was released from the hospital and into the care of the parents. Shortly thereafter, the caseworker noticed that the child had been vomiting for a few days. She advised Mother to take the child to the hospital immediately. Mother disregarded her advice and instead waited for a number of days before taking the child to the emergency room. While at the hospital, Mother reported that she had not fed the child for approximately twelve hours because she did not want him to vomit. CYF also discovered that the family home had a bed bug infestation. At the time the child was admitted to the hospital, CYF had significant concerns about the parents' ability to change diapers, to feed properly, and to care for the child.

On February 17, 2013, CYF requested an Emergency Custody Authorization. The child was placed in the care of S.H. and F.H. (hereinafter foster parents) ten days after removal. On May 8, 2013[,] the child was adjudicated dependent pursuant to 42 Pa.C.S. §6302(1) as to both Mother and Father. A Family Service Plan (FSP) was developed for Mother[,] and she was directed to continue attending mental health treatment, follow any recommendations, attend an AFA individual and interactional evaluation and follow any recommendations, and assist CYF in scheduling an Alliance for Infants Evaluation. Mother was also ordered to attend Domestic Violence counseling, obtain a PFA against Father, address pending criminal charges, address parenting and attend classes, address mental health and cooperate with her case manager, and to sign all necessary releases.

Mother completed domestic violence counseling at the Women's Center and Shelter. However, Mother continued to maintain a romantic relationship with Father despite ongoing domestic violence. She was minimally compliant with her mental health goal, and was inconsistent with her treatment. CYF provided Mother with a number of services along with referrals to the Office of Intellectual Disabilities and TRAC [(Three Rivers Adoption Council)].

During visits, Mother displayed irrational fears about common health issues. Specifically, she insisted that the child had a staph infection when he had a diaper rash. Mother demanded that the child be taken to the emergency room on a number of occasions for relatively mild afflictions such as a slight fever and a runny nose. Mother's visits with the child have never progressed to unsupervised while the case was open. Mother completed parenting programs through Arsenal and TRAC but made very little progress in appropriately parenting the child during visits. Despite extensive instruction, Mother's limitations have impacted her ability to supervise, provide appropriate care, and ensure the child's safety.

Dr. O'Hara conducted an interactional evaluation of the child and Foster Parents on April 22, 2013. The child was relaxed and comfortable during the interactional with foster parents. They exhibited positive parenting skills and were attune[d] to the child's needs. There was also an interactional evaluation of the child and Mother[,] and an individual evaluation

of Mother scheduled for the same day, but Mother failed to appear.

On June 3rd 2013, Dr. O'Hara conducted an individual evaluation of Mother[,] and an interactional between her and the child. Mother exhibited extremely poor parenting skills and was not attune[d] to his cues. Mother displayed a number of concerning behaviors including forcing a bottle in his mouth on several occasions and jerking him suddenly. Dr. O'Hara opined that he would have serious safety concerns if Mother was permitted unsupervised contact with the child. He expressed doubt that she could ever reunify with the child.

Dr. O'Hara conducted an interactional evaluation of Foster Parents and Child on May 14, 2014. They continued to demonstrate strong parenting skills[,] and the child was securely attached to Foster Parents. There was also an interactional evaluation between Mother and the child. Mother showed some improvement in that she was more calm and relaxed. However, collateral information provided to the doctor revealed that Mother had not been compliant with her mental health treatment.

Foster Parents participated in an interactional evaluation with the child on September 23, 2014. The child displayed a secure attachment to Foster Parents. Dr. O'Hara opined that [a]doption by the Foster Parents would meet the child's needs and welfare[,] and that adoption would outweigh any possible detriment in the termination of parental rights.

Dr. O'Hara conducted a final set of evaluations on September 23, 2014. He reported ongoing concerns about Mother's mental health as she had not been participating in treatment since June. Mother showed a poor understanding of the child's capabilities and did not appropriately supervise him. At the time of that evaluation, Dr. O'Hara opined that termination was appropriate[,] as Mother was unable to appropriately meet the needs and welfare of the child. Dr. O'Hara did not believe that Mother had the capability to progress past unsupervised visits based upon her lack of progress.

. . . At the date of termination, Mother had attended two medical visits and [a]sthma training. The child continues to suffer from

- 4 -

[a]sthma[,] and requires a nebulizer and a humidifier in his bedroom at night.

Trial Court Opinion, 2/4/15, at 1-5 (unnumbered pages) (footnote omitted).

On December 4, 2014, the trial court involuntarily terminated Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

On January 2, 2015, Mother timely filed a notice of appeal, along with a concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On appeal, Mother raises one issue:

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that termination of Appellant's parental rights would serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 5.

We review an appeal from the termination of parental rights in accordance with the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 650 A.2d 1064, 1066 (Pa. 1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

**Id.** (quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003)). As this Court may affirm the trial court's decision concerning the termination of parental rights with regard to any one subsection of section 2511(a), **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), we will focus on section 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

While we would address the trial court's findings relative to section 2511(a), *In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*), Mother concedes that there was competent, clear and convincing evidence in the record to support the trial court's termination of her parental rights under section 2511(a)(2). Mother's Brief at 9. Because we agree with the trial court's findings and Mother's concession with respect to section 2511(a), we next review whether the requirements of section 2511(b) are satisfied. *In re Adoption of C.L.G.*, 956 A.2d at 1009.

- 7 -

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child when considering section 2511(b). *Id.* at 1008. In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013).

The trial court stated the following with regard to section 2511(b):

> Mother could not provide the child with a healthy or safe environment and has been unable to remedy the condition which brought him into care. Mother continues to suffer from ongoing parenting deficits including supervision and lack of understanding regarding the child's capabilities. Additionally, Mother suffers from extensive mental health issues and cognitive limitations which have rendered her incapable of internalizing the skills that Achieva and TRAC have provided to her. Mother has been sporadic at best in complying with mental health treatment. Mother displayed a wide range of emotions during these evaluations most notably externalizing responsibility for the child remaining in placement.
>
> The child has been in the care of the foster parents since he was one month old and has developed a primary bond with them. They have consistently presented with stability and

positive parenting skills. Furthermore, Dr. O'Hara opined that the attachment between the child and Mother is not a secure one. It is the opinion of this [c]ourt that the termination of parental rights is in the child's best interests[,] and that adoption by the foster parents outweighs any possible detriment in the termination of parental rights of Mother.

The [c]ourt has considered the nature and status of the bond between Mother and the child[,] and considered the effect of severing it. The [c]ourt does find that CYF met their burden by clear and convincing evidence and that it is in the best interests of the child to grant the petition to terminate parental rights. The order of the [c]ourt should be affirmed.

Trial Court Opinion, 2/4/15, at 5-6 (unnumbered pages).

Mother contends that the trial court abused its discretion and erred as a matter of law, under section 2511(b), in concluding that the termination of her parental rights would serve the needs and welfare of Child. Mother's Brief at 12. Moreover, Mother argues that the trial court failed to analyze the bond between Mother and Child and the emotional effect that termination would have on Child. *Id.* She claims that the court improperly shifted the focus of its consideration to the fault of Mother in failing to meet her FSP goals. *Id.*

After review, we discern no merit in Mother's argument. With regard to the bonding analysis, we have stated that the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the

child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008).

Here, CYF presented the testimony of its caseworker, Ms. Walz, and did in fact present a psychological expert, Dr. O'Hara, with respect to the bond analysis. Ms. Walz testified that Child has been in placement with his foster parents, who are adoptive resources, since mid-February of 2013, when he was six weeks old. N.T., 11/18/14, at 16. Ms. Walz testified that Child, who was born prematurely, has asthma and that his foster parents keep a nebulizer with him to use if he starts wheezing, and they utilize a humidifier in his room at night. N.T., 11/18/14, at 34. Ms. Walz also testified that while Mother had attended asthma training, it was difficult to assess its usefulness because Mother tends to misinterpret and overreact to Child's symptoms. *Id.* at 35.

Ms. Walz testified that despite parenting training, Mother does not maintain her attention on Child during her visits, and she is a safety risk to Child because she cannot do two things at one time. N.T., 11/18/14, at 36-37. In fact, Mother's visits with Child were never unsupervised because Mother has had little improvement in her parenting abilities, even after completing parenting classes. *Id.* at 37-38. Mother attended only two-thirds of the potential visits and cancelled the remaining third. *Id.* at 39. CYF was concerned that Mother had maintained a relationship with Father throughout the history of the case, even after she successfully completed a

domestic violence program. *Id.* at 24-25. Ms. Walz expressed concern that Mother minimizes all domestic violence incidents and does not even acknowledge Father's domestic violence, mental health, and anger management issues, for which he has not been treated. *Id.* at 25.

Ms. Walz testified that CYF removed Child from the parents' home because: 1) they both lack parenting skills and have mental health issues; 2) there were issues with domestic violence and Father's drug and alcohol issues; and 3) Child had remained in care because of those issues. N.T., 11/18/14, at 45. In addition, other problems existed, including Father's lack of housing, poor anger management, mental health issues, and his failure to address those matters. *Id.* Ms. Walz also stated that Mother's mental health and mental retardation diagnoses impact her ability to appropriately supervise, parent, and ensure Child's safety. *Id.* Ms. Walz testified that termination of the parental rights of both parents would meet Child's needs and welfare, stating the following:

> The parents haven't been able to show much stability at all. Father hasn't addressed any of his goals, including drug and alcohol, mental health, anger management, housing, [and] visitation. Mother, her mental health continues to be of concern. She's not compliant with her treatment and has not been for some time now.
>
> Her limitations also are significant, impact on her ability to supervise, provide appropriate care, [and] ensure his safety, and she hasn't been consistent either in her visitation although better than Father's, but it hasn't been consistent over the course of the case.

> And there's been numerous concerns again in regards to her housing as well. [Child] needs to be in an environment where he's going to get the appropriate treatment that he needs where all of his needs are going to be consistently addressed.

N.T., 11/18/14, at 47-48.

Additionally, Ms. Walz testified that Child is presently in an environment where his foster parents address all of his needs. N.T., 11/18/14, at 48. On cross-examination by Mother's counsel, Ms. Walz testified that Mother potentially could be evicted from her current housing, and that Father spends a significant amount of time at Mother's home. *Id.* at 48-49. She also testified that Mother had missed one out of every four of her visits with Child during the two months preceding the termination hearing. *Id.* at 53.

On cross-examination by the guardian *ad litem*, Ms. Walz stated that Mother needed to improve her parenting skills, and that her improvement in parenting skills was not sufficient to progress to unsupervised visitation and reunification with Child. N.T., 11/18/14, at 55. Ms. Walz also explained CYF's concern that, although there had not been any additional domestic violence reports by Mother against Father, Father had not completed any domestic violence classes or satisfied his other treatment goals. *Id.* at 57. Ms. Walz testified that she regularly observed Child in the home of his foster parents. *Id.* She has observed that Child is completely comfortable in the home of his foster parents, and that Child is always happy and energetic. *Id.* Ms. Walz testified that the foster mother is very affectionate, and that

Child is very affectionate towards her, goes to her for comfort, and appears very bonded with her. *Id.* at 57.

Dr. O'Hara conducted several individual evaluations of Mother, and interactional evaluations of Child with Mother, and several interactional evaluations of Child with his foster parents, but only one interactional evaluation of Child with Father. N.T., 11/18/14, at 62-63. Dr. O'Hara testified that, at the time of his evaluations in June of 2013, he observed no evidence that Mother could appropriately care for Child, and that, if Mother were permitted to have unsupervised contact with Child, Child would have safety issues. *Id.* at 72-73, 75.

Dr. O'Hara testified that in his September 2014 evaluations, he noted that Mother exhibited some positive parenting skills but was slow to respond to Child, who is very active, and had a poor understanding of Child's developmental capabilities as a two-year-old child. N.T., 11/18/14, at 80-81. Dr. O'Hara observed that Child's foster mother did a good job of closely monitoring and following Child. *Id.* at 80. Dr. O'Hara was also concerned Mother disclosed that at the time of Child's removal from her care, Child was living in a house infested with bed bugs, which she viewed as the only alternative to living in the streets. *Id.* at 81-82. Dr. O'Hara opined that there is no evidence that Mother is able to meet Child's needs and welfare, and that the prognosis for her to have unsupervised contact with Child is

extremely poor, as she has not benefitted from intensive services.  *Id.* at 83.

Dr. O'Hara observed that on several occasions during his evaluation with Mother in September of 2014, Child attempted to leave. N.T., 11/18/14, at 82.  Dr. O'Hara believed that Child's attempts to leave reflected the inconsistency in visits involving Child and Mother, and that Child did not have a secure bond with Mother because she was not attuned to his needs. *Id.*  Dr. O'Hara testified that the effect on Child of terminating Mother's parental rights would be that Child would have the benefits of adoption, including security and permanency from the foster parents.  *Id.*  Dr. O'Hara did not believe that Child's attachment with Mother is a secure attachment, and he opined that the termination of Mother's parental rights would serve Child's best interests.  *Id.* at 83.  Dr. O'Hara cocnluded that the benefit of adoption outweighed any possible detriment to Child from the termination of Mother's parental rights.  *Id.*  On cross-examination by Mother's counsel, Dr. O'Hara explained that he did not believe there was any significant potential detriment to Child.  *Id.* at 85.

Based on the foregoing, we agree with the trial court's conclusion that there is ample, competent, clear and convincing evidence in the record establishing that Mother cannot meet Child's needs and welfare, and that Child's foster parents meet all of his needs and welfare.  Further, the competent evidence in the record, Ms. Walz's testimony, and Dr. O'Hara's

expert testimony support the trial court's determination that Child's relationship with Mother is such that Child would not suffer any harm from the termination of Mother's parental rights, and that the termination of Mother's parental rights would serve Child's best interests. Accordingly, we affirm the trial court's order terminating Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/7/2015